**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

UNITED STATES OF AMERICA

vs.                                                              Case No. 6:12-cr-121-Orl-37KRS

REBECA RIVERA

**ORDER**

This cause is before the Court on the following:

1. Defendant Rivera's Renewed Motion for Judgment of Acquittal and Memorandum of Law in Support (Doc. 126), filed November 15, 2012; and

2. United States' Response Opposing Defendant's Renewed Motion for Judgment of Acquittal (Doc. 130), filed December 6, 2012.

Upon consideration, the Court hereby denies the motion.

**BACKGROUND**

On November 5, 2012, a federal jury convicted Rebeca Rivera of aiding and abetting the sex trafficking of a minor, T.M., in violation of 18 U.S.C. §§ 1591(a) and 2 (Count I), as well as two counts of aiding and abetting the transportation of a minor, T.M., in interstate commerce with the intent to engage in criminal sexual activity in violation of 18 U.S.C. §§ 2423(a) and 2 (Counts II and III). (Doc. 117.) Count II involved T.M.'s transportation from Florida to Connecticut and Count III involved T.M.'s transportation from Connecticut to Florida. (Doc. 57.) Rivera's co-defendant, Luis Morales, was convicted on six counts. (Doc. 116.)

At trial, the Government presented evidence of the following.[1] Rivera, Morales,

---

[1] The Court draws this evidence from witness testimony and exhibits that were

T.M., and T.M.'s family were all members of a ministry called "En Fuego for Jesus." T.M. was a minor at the time of the described events. Morales was the ministry's leader, known as the "Apostle," and Rivera was a prophet. T.M. testified that she wanted to become a prophet in the ministry. The Government presented testimony that becoming a prophet has value to members of the ministry because one communicates with God and shares a closeness with God. A prophet in the ministry testified that being a prophet has value to her. Morales's wife testified that while becoming a prophet has no monetary value, it is an honor that God bestows and that allows one to speak the word of God. Though T.M.'s sister, D.M., was never ordained, D.M. testified that she wanted to become a prophet so that she could bless people. T.M. testified that she wanted to become a prophet in order to know the Bible and to be able to share it with others.

During En Fuego for Jesus meetings in Florida, Morales would fondle T.M. Eventually, Morales chose T.M. to become a prophet. On the path to becoming an ordained prophet, T.M., who lived in Florida, communicated via telephone and the Internet service Skype with Rivera, who lived in Connecticut. Rivera provided T.M. with teachings of the ministry. T.M. considered Rivera to be like a sister to her and looked up to Rivera because of her status as a prophet and because she a talented singer. Rivera was a gospel singer and her music was popular in Central America. T.M. aspired to make a gospel album of her own. T.M. observed that Rivera had a close connection with Morales.

Morales told T.M. to ask her parents to allow her and her sisters to travel alone to Connecticut with him. Morales told T.M. that she and her sisters would record an album

---

submitted at trial. The Court has conducted a thorough review of the trial transcript, though a certified copy was not available for citation purposes. The Court construes the evidence in the light most favorable to the Government.

there. T.M.'s parents agreed to allow T.M. and her sisters to travel to Connecticut with Morales, but only with T.M.'s uncle. In November 2009, T.M. and her sisters stayed at Morales's home in Florida. Morales fondled T.M. while she was at his home. Later, Morales, T.M., T.M.'s sisters, and T.M.'s uncle departed on a road trip to Connecticut. During the trip, Morales fondled T.M. in the back of the minivan they were driving.

When the group arrived in Connecticut, they went to Rivera's home as their first stop. Upon their arrival, Rivera was excited to see Morales and hugged him. The group took a nap at Rivera's home. T.M. stayed overnight at another prophet's home during the trip. Every day, Rivera would come to the home to visit. On a trip to the store to buy Morales some soup, Rivera told T.M. that she needed to "put [her] private area in [Morales's] face."[2] On a trip to the mall to shop for clothing, Rivera exposed her breasts to Morales in a dressing room while T.M. was present; she and Morales then told T.M. that it was her turn to do so, which T.M. did. On the way home from the mall, Rivera stopped the vehicle in which she, Morales, and T.M. were riding and began to touch Morales sexually. Morales responded by saying that he "want[ed]" T.M., not Rivera. Later, at the home at which T.M. was staying, while she, Rivera, and Morales were sitting on a couch, Rivera began to masturbate Morales. Rivera put T.M.'s hand over hers to make T.M. masturbate him, too. At some point, Rivera told T.M. that in order to become a prophet, she needed to keep her mouth shut about the sexual encounters.

Later during the trip, T.M. was ordained as a prophet by Morales. Morales gave T.M. an ordination certificate, an identification card, and an iPod. Eventually, the group left Connecticut for Florida. During the drive, Morales fondled T.M. Morales also

---

[2] While at first T.M. used the phrase "private area" in her testimony, when the Government asked what word Rivera actually used, T.M. spelled out the word "pussy."

3

molested T.M. when they arrived back at his home in Florida. Morales told her that good prophets keep their mouths shut and would go to heaven if they did so. Morales gave T.M. fifty dollars the next day, which she testified made her "feel dirty." Morales also told her that he would give her a cell phone.

T.M.'s parents hung T.M.'s ordination certificate in their home because they were proud that T.M. was a prophet. T.M. later received a cell phone from a prophet at Morales's direction[3] and Morales told T.M. that she could only talk to him on the phone. Morales had sexually explicit conversations with her over the phone. On one occasion, Morales masturbated while T.M. listened. On another occasion, Morales placed a three-way call between himself, T.M., and another prophet, and he made T.M. listen to the other prophet masturbate.

On another occasion, T.M. and her sisters, N.M. and D.M., were at Morales's home in Florida with their father. At one point, Morales was alone with N.M. Morales called a female prophet on speakerphone. Morales told N.M. that he would need to "break [her] bones" in order for her to become a prophet. The female prophet on the line agreed. Morales molested N.M. and told her that she needed to let him break her bones. Later that day, the sisters left Morales's home to go to the hospital because T.M. was sick. Phone records show that a nine-minute phone call was made from Morales's home[4] to Rivera's home[5] on the afternoon of May 24, 2010. Hospital records show that

---

[3] T.M. testified that Morales told her he was going to get her a cell phone. T.M.'s mother testified that Morales said he was going to get T.M. a cell phone and to expect it in the mail. A prophet in the ministry testified that she sent T.M. a cell phone at the direction of Morales and her husband.

[4] The telephone account associated with the outgoing call was registered in the name of Morales's wife and was a land line.

[5] The telephone account associated with the incoming call had been listed by Rivera's husband as their home phone number when he subscribed for a cell phone.

4

T.M. was admitted to the hospital on May 24, 2010.

In January 2011, another minor in the ministry, M.R., was molested by Morales. Morales placed a three-way call between himself, M.R., and Rivera. Morales told Rivera that he was going to "fuck"[6] M.R. and he asked Rivera if she wanted to listen. Rivera said that she did and that she would like to be there for it. Like T.M., Rivera had given M.R. teachings of the ministry.

The Court previously denied three oral motions for judgment of acquittal by Rivera. (Docs. 99, 100, 103, 104, 106, 107.) Rivera again moves for judgment of acquittal, arguing that: (1) as to Count I, the Government failed to prove that she committed or aided and abetted Morales in committing an act that affected interstate commerce; and (2) as to Counts II and III, the conviction is not supported by record evidence. (Doc. 126.) The Government opposes. (Doc. 130.)

## STANDARDS

"The test for reviewing sufficiency of the evidence is whether, viewing the evidence and all reasonable inferences therefrom in the light most favorable to the [G]overnment, substantial evidence exists to support the verdict." *United States v. Schwartz*, 666 F.2d 461, 463 (11th Cir. 1982) (citing *Glasser v. United States*, 315 U.S. 60, 80 (1942); *Hamling v. United States*, 418 U.S. 87, 124 (1974)). A court need only find that a reasonable juror could conclude that the evidence establishes the defendant's guilt beyond a reasonable doubt. *United States v. Hasson*, 333 F.2d 1264, 1270 (11th Cir. 2003). "[I]t is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of

---

[6] M.R. testified that Morales stated, "I'm going to 'F' her." When asked whether Morales said this in English or Spanish, M.R. explained that Morales used the Spanish equivalent of the word "fuck."

5

guilt. A jury is free to choose among reasonable constructions of the evidence." *United States v. McCarter*, 219 F. App'x 921, 927 (11th Cir. 2007) (citation omitted). Furthermore, a court is "bound by the jury's credibility determinations, and by its rejection of the inferences raised by the defendant." *United States v. Peters*, 403 F.3d 1263, 1268 (11th Cir. 2005) (citation omitted).

## DISCUSSION

Rivera argues that she had no knowledge of T.M.'s transportation across state lines and thus took no actions affecting interstate commerce, an element of each of the three crimes for which she was convicted. (Doc. 126, pp. 3–4.) Rivera contends that during the trial, T.M. acknowledged that she had no role in T.M.'s travel from Florida to Connecticut and back. (*Id.* at 4.) Rivera states that even if she had knowledge of the transportation, mere acquiescence to T.M.'s transportation across state lines is insufficient as a matter of law to support her conviction. (*Id.* at 5.) Rivera's scenario of the events—that she did not know that T.M. would be transported across state lines and did not aid or abet the transportation—is not wholly implausible, and perhaps another jury could have come to a different conclusion than the jury that actually tried her case. However, that is not the test; the test is whether a reasonable juror could have found Rivera guilty beyond a reasonable doubt on the evidence presented, viewed in the light most favorable to the Government.

A person who aids or abets a federal crime "is punishable as a principal." 18 U.S.C. § 2. Under an aiding and abetting theory, the Government must show that the defendant: (1) "in some way associated [herself] with the criminal venture"; (2) "wished to bring it about"; and (3) "sought by [her] actions to make it succeed." *United States v. Broadwell*, 870 F.2d 594, 608 (11th Cir. 1989) (citations omitted). The defendant does

6

not need to have committed "the overt act that served to accomplish the offense" or even have knowledge of the "particular means" employed by the principal "to carry out the criminal activity." *Id.* (citing *United States v. Austin*, 585 F.2d 1271, 1277 (5th Cir. 1978)). "The aiding and abetting statute allows the jury to find a person guilty of a substantive crime even though that person did not commit all acts constituting elements of the crime." *Id.* (citing *United States v. Pearson*, 667 F.2d 12 (5th Cir. 1982)).

The charging statute in Count I, 18 U.S.C. § 1591(a), makes it an offense to (1) knowingly recruit, entice, harbor, transport, provide, obtain, or maintain by any means a person (2) in or affecting interstate commerce (3) knowing or in reckless disregard of the fact that the person is under eighteen years old and will be caused to engage in a commercial sex act. The charging statute in Counts II and III, 18 U.S.C. § 2423(a), makes it an offense to (1) knowingly transport in interstate commerce (2) a minor (3) with the intent that the minor engage in unlawful sexual activity. Under these charging statutes, the issue is whether sufficient evidence was presented such that a reasonable jury could conclude that Rivera aided and abetted the transportation of T.M. across state lines for the purpose of a commercial sex act (Count I) or unlawful sexual activity (Counts II and III).[7] The Court finds that a reasonable juror could conclude for each count that Rivera associated herself with the criminal venture, wished to bring it about, and sought by her actions to make it succeed.

### a. Transportation in Interstate Commerce (All Counts)

A reasonable juror could conclude that Rivera aided and abetted T.M.'s transportation across state lines. The evidence presented at trial showed that Rivera

---

[7] The Court finds that a reasonable juror could conclude that Rivera knew that T.M. was under the age of eighteen years based on the fact that Rivera had a number of telephone and Skype conversations with her.

7

spoke to T.M. many times before the trip and that Rivera and Morales had a close relationship. A juror could conclude that Rivera knew that T.M. was from Florida and that T.M. and her sisters were coming to Connecticut with Morales. The evidence further showed that the first stop of the Florida group upon arriving in Connecticut was Rivera's home, where the group took a nap. Based on this evidence, a reasonable juror could infer that Rivera had advanced knowledge that the group would be stopping at her house after the interstate trip and that she would be assisting with their accommodations. Thus, a reasonable juror could conclude that Rivera knew that T.M. was going to be transported from Florida to Connecticut and back,[8] and that Rivera willfully participated in and affirmatively enabled that transportation by both preparing T.M. for the trip through their conversations and assisting with accommodations when the group arrived. As such, the evidence is sufficient to support the reasonable conclusion that Rivera aided and abetted T.M.'s transportation across state lines from Connecticut to Florida and vice versa.

### b. Commercial Sex Act (Count I)

A reasonable juror could conclude that Rivera aided and abetted the transportation of T.M. with the knowledge or in reckless disregard of the fact that T.M. would be caused to engage in a commercial sex act. 18 U.S.C. § 1591 defines "commercial sex act" as "any sex act, on account of which anything of value is given to or received by any person." The evidence established that Morales engaged in sexual conduct with T.M., and T.M. received a thing of value in the form of her ordination as a prophet. Multiple members of the ministry testified that becoming a prophet was

---

[8] Because this was a trip—T.M. was not moving to Connecticut—it was necessarily a roundtrip.

8

valuable because it is an honor, it allows one to be close to God, and it allows one to share God's word with others. T.M. was chosen by Morales to be ordained as a prophet and Rivera acted as a mentor leading up to T.M.'s ordination by providing T.M. with ministry teachings over the phone. T.M. wanted to become a prophet in the ministry, and Morales and Rivera told T.M. that in order to become a prophet, T.M. needed to keep her mouth shut about the sex acts with Morales. Thus, T.M. received ordination from Morales while Morales received sexual activity from T.M.

While ordination as a prophet is an intangible, rather than a tangible thing of monetary value, the term "anything of value" encompasses more than just monetary gain and thus encompasses T.M.'s ordination. In statutory construction, words are given their plain meaning, *see CBS, Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1225 n.6 (11th Cir. 2001), and the word "any" is "a powerful and broad word, . . . [that] does not mean 'some' or 'all but a few,' but instead means 'all.'" *Price v. Time, Inc.*, 416 F.3d 1327, 1336 (11th Cir. 2005). Indeed, "anything" is defined as "a thing no matter of what kind." Webster's New World Dictionary & Thesaurus 25 (1996); *see CBS, Inc.*, 245 F.3d at 1223 (11th Cir. 2001) ("In order to determine the common usage or ordinary meaning of a term, courts often turn to dictionary definitions for guidance."). Further, "Congress' frequent use of 'thing of value' in various criminal statutes has evolved the phrase into a term of art which the courts generally construe to envelop[] both tangibles and intangibles. This broad interpretation is based upon a recognition that monetary worth is not the sole measure of value." *United States v. Nilsen*, 967 F.2d 539, 542–43 (11th Cir. 1992) (citations omitted) (holding that witness testimony is a thing of value under an extortion statute); *see also, e.g.*, *United States v. Townsend*, 630 F.3d 1003, 1011 (11th Cir. 2011) (concluding that freedom from jail is a thing of value under a bribery statute).

9

Thus, T.M.'s ordination was a thing of value bestowed on her by Morales on account of the sex acts he performed with her.

Because Rivera provided T.M. with teachings of the ministry on her path to becoming a prophet and told T.M. that she needed to keep her mouth shut about Morales's sexual conduct if she wanted to be ordained, a reasonable juror could conclude that Rivera aided and abetted T.M.'s transportation across state lines with the knowledge or in reckless disregard of the fact that she would be caused to engage in a commercial sex act—namely, that Morales would ordain T.M. as a prophet if she engaged in sex acts with him.[9]

### c. Unlawful Sexual Activity (Counts II and III)

A reasonable juror could conclude that Rivera intended T.M. to engage in unlawful sexual activity, specifically Morales's sexual activity with T.M., a minor.[10] The Government presented evidence that Morales specifically chose T.M. to become a prophet. He groped and molested her and told her that a good prophet would allow him to do so and would keep her mouth shut. The evidence showed that Rivera personally participated in some of these sexual acts, such as the flashing incident in the dressing room, the touching incident in the car, and the masturbation incident on the couch. *See United States v. Knight*, 381 F. App'x 942, 945 (11th Cir. 2010) ("[A] defendant's intent may be bolstered by evidence that the defendant did engage in sexual activities with the minor after crossing state lines."). The Government also presented evidence of Rivera's

---

[9] While the Court finds the exchange of ordination as a prophet for sexual activity sufficient to establish the commercial sex act element, the Court also notes that T.M. received fifty dollars in cash, an iPod, and a cell phone from Morales. T.M. testified that when Morales gave her the fifty dollars after he molested her, she "felt dirty." Morales promised T.M. the cell phone after he molested her and later had one sent to her.

[10] *See* Conn. Gen. Stat. § 53a-70(a)(2); Fla. Stat. § 800.04(4)(a).

phone conversations between her, Morales, and other minors, N.M. and M.R., involving sexual conversations and molestation. A reasonable juror could conclude that Rivera knew of Morales's sexual abuse of minors, particularly ones he had chosen for ordination as prophets.

Indeed, one could infer that Rivera "recruited" T.M. Rivera spoke to T.M. on a number of occasions prior to the trip to Connecticut, giving her teachings of the ministry. Rivera told T.M. that a good prophet would not tell anyone about the sexual abuse that Morales imposed. Thus, a reasonable juror could infer that Rivera groomed T.M. to become a prophet—and a submissive one—so that Morales could molest her. One could therefore reasonably conclude that Rivera aided and abetted T.M.'s transportation so that Morales could molest her on the trip. Given Rivera's grooming of T.M. and her personal involvement in sexual conduct with T.M. and others to whom Morales had promised prophethood, a reasonable juror could have concluded that Rivera aided and abetted T.M.'s transportation with the intent that T.M.—on the way from Florida to Connecticut, in Connecticut, and on the way from Connecticut to Florida[11]—engage in unlawful sex acts with Morales.

Rivera fails to convince the Court that no rational jury could consider the evidence—viewed in the light most favorable to the Government—and conclude that she aided and abetting Morales in carrying out the crimes. That is, based on the

---

[11] While it is intuitive that Rivera aided and abetted the entire roundtrip, the Court wishes to make this point clear as to Count III. Rivera knew that T.M. would be transported back to Florida from Connecticut. It is a reasonable inference that the sexual abuse would happen not only on the way to Connecticut or in Connecticut, but also on the way back to Florida because Morales was traveling with T.M. This inference sufficiently underpins the charge in Count III that Rivera aided and abetted T.M.'s transportation from Connecticut to Florida with the intent that T.M. engage in unlawful sexual activity.

evidence presented, a reasonable juror could conclude that Rivera aided and abetted T.M.'s transportation in interstate commerce knowing or in reckless disregard of the fact that T.M. would be caused to engage in a commercial sex act (meeting the elements of Count I) and with the intent that T.M. would engage in unlawful sexual activity in Connecticut and on the way to and from Connecticut (meeting the elements of Counts II and III). Thus, the motion for judgment of acquittal is due to be denied.

## CONCLUSION

Accordingly, it is hereby **ORDERED AND ADJUDGED** that Defendant Rivera's Renewed Motion for Judgment of Acquittal and Memorandum of Law in Support (Doc. 126) is **DENIED**.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on December 17, 2012.

ROY B. DALTON JR.
United States District Judge

Copies:

Counsel of Record